[S. F. No. 17139. In Bank. July 26, 1946.]

LLOYD M. TAYLOR, Appellant, v. GEORGE A. SELIG et al., Respondents.

Vincent Surr and Morgan V. Spicer for Appellant.

Fred A. Watkins for Respondents.

CARTER, J.—Plaintiff appeals from a judgment declaring the defendant George A. Selig to be the owner of a half interest in an invention.

In 1936 defendant George A. Selig and plaintiff were working as mechanics for United Air Lines in Oakland, California, at which time they became acquainted. Plaintiff had an idea for the invention of an internal combustion engine. The idea was incomplete and needed considerable development. Selig became interested in the idea and the two men worked together on it in their spare time. During the latter part of 1936 and the first part of 1937 they consulted Mr. White, a patent attorney, with reference to protecting the invention by obtaining a patent therefor. The charges for services and fees in connection with the patent were paid for by Selig, totalling $867. After explaining to White concerning their joint efforts in connection with the invention and that each was to have a one-half interest therein, he suggested that the patent be obtained in plaintiff's name, and that plaintiff would then assign a one-half interest therein to Selig. An agreement (hereinafter referred to as agreement) was made between plaintiff and Selig on March 20, 1937, reciting that plaintiff was the inventor and is ''desirous of having the services and financial support of . . . [Selig] for further experimentation work on said invention, the commercial exploitation thereof and the securing of Letters Patent therefor; and

''. . . [Selig] is desirous of lending his assistance and financial support to said INVENTOR and has heretofore aided said INVENTOR with respect to the provision of facilities for experimentation work and has provided funds in furtherance of the commercial advancement of said invention.'' Plaintiff agreed to assign to Selig a one-half interest in ''the entire right, title and interest in and to said invention and improvements thereof; and in and to any and all Letters Patent that may be granted on said invention and/or improvements thereof by the United States or any foreign country.'' Selig promised in paragraph 2 that he would ''advance all funds necessary for the protection of said invention including applications for Letters Patent on said invention and/or improvements thereof, and all necessary expenses for the prosecution of said applications for Letters Patent. . . . [Selig] further covenants and agrees to continue to use his best efforts and to advance funds and to provide facilities for the further development of said invention and/or improvements

thereof, and toward interesting third parties in the commercial exploitation of said invention." On April 17, 1937, plaintiff gave the assignment to Selig reciting that it was in consideration of $1.00 "in hand paid to said . . . [plaintiff] by said GEORGE A. SELIG, and other good and valuable consideration, the receipt of which in full is hereby acknowledged by LLOYD M. TAYLOR."

Consultations with reference to the invention were had with the General Electric Company in New York, in connection with which the expenses were shared equally. At the suggestion of the company plaintiff and Selig, by their combined efforts, prepared blueprints of the engine and sent them to the company. Receiving a favorable report the "first cast" was completed, the materials therefor being paid for by Selig. He also financed plaintiff's trip to New York with a model of the engine. After the assignment to Selig and the execution of the agreement, he spent $692.94 for the support of plaintiff while the latter was working on the engine and $249.10 for materials in the construction of the engine. In 1938 Selig's funds were exhausted. Plaintiff knew of that fact and they discussed ways and means of further promoting the invention. It was agreed that a corporation would be formed to assist in financing the project. After several contacts were made to further the advancement of the enterprise and had proved unsuccessful, in January, 1940, defendant Harry Selig, defendant George Selig's father, came into the picture and it was arranged by George Selig, Harry Selig and plaintiff that a California corporation be formed. According to the testimony of George Selig, the conversation between them was to the effect that they "needed more money to go ahead, and a corporation suggested itself as the only means of continuing, and Mr. Taylor (plaintiff) agreed in front of us—in front of my father and myself—that that was the only thing to do. And during that conversation it was also brought up that I would go to Los Angeles and continue my business efforts there. My father would help Mr. Taylor (plaintiff) get organized in San Francisco and Oakland to carry out this development." Thereafter George Selig left for southern California and the California corporation (All Steel Engine Company) was formed by Harry Selig and plaintiff. Plaintiff and George Selig were directors of the corporation. In June, 1941, unsuccessful efforts were made to develop the project through the Ford Motor Company. While in southern Cali-

fornia George Selig worked on prospective deals for the manufacture and development of the engine. He knew nothing of the steps in launching the California corporation and was summoned to a meeting of the corporation directors in January, 1941. Prior to that time plaintiff had never at any time claimed or stated that George Selig had failed to advance the money he had agreed to raise or breached the agreement, and at this meeting all of the directors including plaintiff were present. Plaintiff and George Selig gave defendant All Steel Engine Company, the California corporation, an exclusive license to manufacture and sell the engine in the United States and Canada for which plaintiff and George Selig were to receive stock. Difficulties being encountered in issuing the stock of that company, plaintiff, George Selig and others organized a corporation in Nevada, defendant, All Steel Engines, Inc., and gave to it a similar exclusive license. The latter company agreed to issue 51 per cent of its stock to plaintiff and George Selig for the license.

Plaintiff, denominating the present action as one for declaratory relief, sets forth three purported causes of action. In the first he prays for a declaration of his, George Selig's and the two corporation's rights in the invention. He charges that George Selig falsely represented that he had.$6,000 and was able and willing to advance $5,000 or $6,000 for the development of the invention,. and in reliance thereon, he (plaintiff) assigned a half interest in the invention to George Selig and executed the agreement above mentioned; that in January, 1941, he offered to restore the moneys advanced by George Selig and rescinded the assignment and agreement.

In the second cause of action plaintiff realleges the fraud and asserts that George Selig told him that Harry Selig was a competent promoter and plaintiff relied on his advice and joined in the formation of the California and Nevada corporations and executed the licenses to them.

In the third cause of action plaintiff realleges parts of the first and second causes of action and states that the Nevada corporation transferred its license rights to Kinner Motors, Inc. without plaintiff's consent and that the latter acquired no rights therein.

Plaintiff prays that it be declared that a rescission has taken place, that neither George Selig nor the corporations have any rights in the patent, and that plaintiff is the sole owner thereof.

The court found against plaintiff on his charge that George Selig represented that he had and would advance $5,000 or $6,000 to develop the invention. Plaintiff asserts that that finding lacks evidentiary support. On direct examination George Selig testified that no such representations were made, and evidently the court chose to accept that testimony as true. Plaintiff testified that such representations were made, and George Selig stated on cross-examination that there may have been some talk of $5,000 or $6,000, but any conflict was resolved against plaintiff by the trial court. (*Rice* v. *California Lutheran Hospital,* 27 Cal.2d 296, 301 [163 P.2d 860].)

Plaintiff contends that paragraph 2 of the agreement heretofore quoted required the defendant George Selig to continue to advance all funds necessary for the development of the invention; that the evidence does not support the finding of the court that George Selig would ''according to his financial ability, assist in the development of said invention, and endeavor to raise funds to the best of his ability from other sources''; and that George Selig defaulted in his promise. Paragraph 2 of the agreement may be subject to plaintiff's interpretation but it is doubtful. While it is true that it provides that George Selig is to continue to advance funds for further development it does not state how much or the extent of the development to be achieved.

The meaning of the instrument must be ascertained from a reading of the language contained therein, by reference to the surrounding circumstances, the wording of the assignment, the evidence concerning it, and the conduct of the parties. In the light of those factors and the uncertainty of the agreement it is susceptible to the interpretation that George Selig was to advance funds only according to his financial ability, as found by the court, and to use his best efforts to raise funds. It will be remembered that the agreement was followed by plaintiff's assignment to George Selig of a half interest in the invention and any patents procured thereon. Nothing was said therein about George Selig's financing the project, and the recital of consideration for the transfer is to the effect that it (the consideration) had already been received. George Selig as well as plaintiff was a mechanic working for wages and with limited finances. Plaintiff was aware of that circumstance, and the whole relation between the parties was disclosed to White, the patent attor-

ney, when they consulted him with reference to obtaining a patent. With reference to the agreement and the conversation between plaintiff, George Selig and White, George Selig testified: "Well, I noticed where it confined me there definitely to do a lot of things that I couldn't do, and I asked Attorney White—— Mr. Taylor was present—— I said, 'I am just a mechanic; I can't——' . . . Well, Attorney White said that he would draw it up in the same way. He said, 'It is only intended for a few days. It doesn't mean anything.' He said, 'The assignment that Taylor will make on the patent application will take care of your actual conditions. In other words, it will satisfy both of you, but,' he said, 'we will put it in here now, and it doesn't matter very much.'" The instruments were executed in 1937. In 1939 or 1940 after George Selig had advanced about $1,800 he and plaintiff had a discussion. George Selig testified: "Well, we had reached a point where we had constructed this first little engine and built up a small test stand, and we had been approached on two or three occasions by individuals who wanted to make us a deal, and at that particular time, why, *Mr. Taylor and I got together in discussing ways and means to promote this thing further. Mr. Taylor was cognizant of the fact that I had reached a point where it was almost impossible for me to put in any money during that time.* So the first discussion took place on forming a corporation and raising money in that manner to promote this thing to a point where we could still interest a third or fourth party. We wanted to put it in the hands of a responsible manufacturer, but not being successful up to that point we needed this additional money to work on further development." The court found that plaintiff did not at any time complain to George Selig that he was not carrying out his agreement or not advancing funds as obligated. (Plaintiff's attack on that finding will be hereafter discussed.) The corporations were formed to finance and develop the invention and plaintiff actively participated in the formation of them and was a director thereof. ■ From all of these circumstances we conclude that the court had evidence to support its finding that George Selig was obligated to advance funds only so far as his finances justified it and that plaintiff was not entitled to rescind the assignment and no rescission had taken place, that is, he had complied with the agreement or any breach thereof was waived.

Plaintiff contends that there is insufficient evidence to support the court's finding that he "did not at any time protest or assert to said defendant [Selig] or at all that the said defendant had misrepresented his financial condition to plaintiff or the extent to which he would assist plaintiff financially; the first such charge on the part of plaintiff was made as a part of his complaint herein." That is not of controlling significance inasmuch as it is only one of the factors forming the basis for the foregoing conclusion. The evidence pointed to by plaintiff is a letter by him addressed to George Selig dated December 11, 1940, more than three years after the agreement and assignment and after the corporations were formed. In that letter plaintiff stated that George Selig had agreed to promote and finance the invention (Selig had been doing that), that he had failed to do so and that he could terminate his rights by a law suit. He referred to the patents as "our patents." He did not say what steps he was going to take. Moreover, on January 24, 1941, he sent a letter to George Selig complaining of the California corporation and Nevada corporation and that they were violating the corporate securities law and of the licenses given to them. He said then he "was going to ask" George Selig to reassign the half interest in the patent and reimburse his advances or go in on a stock deal with him. Otherwise he is going to "take the matter into the courts." No claim is there made that Selig had not performed his agreement.

The contention of lack of evidentiary support for the findings, that plaintiff did not rescind the assignment, that the letter of January 24, 1941, did not constitute a notice of rescission, and that he made no offer to restore, becomes immaterial in the light of the foregoing discussion. Plaintiff had no right to rescind. There was no default on George Selig's part. For the same reasons plaintiff's argument that he accepted Selig's default and thus accomplished a rescission by consent is not pertinent.

The court's failure to find whether the corporations acted illegally in reference to transactions of business and issuance of stock in California without complying with the California law is claimed by plaintiff as error on the assumption that a court must find on every material issue. In that connection plaintiff also urges that such illegality was ground for rescission of the assignment of the interest in the inven-

tion to George Selig. Whether or not the stock is being illegally issued by the corporations is wholly immaterial so far as the rights under the assignment are concerned. Even assuming that stock is being illegally issued, that is no ground for setting aside the assignment and declaring that George Selig has no interest therein. That transaction is between plaintiff and George Selig and the corporations are not concerned therewith. ■ Moreover, plaintiff was an active participant in the formation of the corporations and is one of the directors thereof. He is not in a position to complain.

■ Nor is the asserted selling of stock by the corporations without a permit ground for plaintiff to rescind the license to the corporations to manufacture and sell the article invented. The court found that no stock had been issued by the California corporation and that the Nevada corporation had agreed to issue 51 per cent of its stock to plaintiff and George Selig for the license granted it. Plaintiff is a participant in the management of the latter corporation. The controversy in this respect would seem to be between plaintiff and the other officers or stockholders, if any, of the corporation but his action does not purport to embrace such issues.

■ Plaintiff contends that the court erred in failing to fully declare his rights; that it failed to determine how the asserted joint venture between plaintiff and George Selig is to be wound up; that friction has developed between the parties and plaintiff cannot be held to be bound by the assignment of the one-half interest in the invention. The court found that George Selig owned a one-half interest and that the Nevada corporation had the exclusive license to handle the engine. That disposed of all the issues between the parties.

Plaintiff urges that the court erred in declaring George Selig's and the Nevada corporation's rights in the invention and license, respectively, because those defendants merely prayed that plaintiff take nothing. Plaintiff, however, asked "That it be determined what rights defendants and each of them, have, if any, in said patent." True the court found that plaintiff did not desire a declaration of his rights and that it was adjudged that he take nothing but that was merely a method of declaring that his attack on Selig's rights was unfounded. The action was litigated upon the basis that a determination should be made of the respective rights of the parties.

■ Finally, it is urged that the judgment is too broad

in its declaration of the scope of George Selig's right in the invention. The judgment declares that George Selig is the owner of a one-half interest in the patents issued on the invention and "any and all alterations, modifications, improvements or substitutions' thereof." The agreement heretofore mentioned called for a transfer to George Selig of a one-half interest in "said invention and improvements thereof." The assignment referred to used the same words and continued, "including each and every Letters Patent granted on any application which is a division, substitution for or continuation of said parent application; and in and to each and every reissue or extension of said Letters Patent." The only words which appear in the judgment different from those in the assignment are "Alterations" and "modifications" but the words "improvements and substitutions" in the assignment are at least as comprehensive as those words.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.