[Civ. No. 24268. Second Dist., Div. One. June 19, 1961.]

PIEDMONT PUBLISHING COMPANY (a Corporation) et al., Respondents, v. MARY PICKFORD ROGERS et al., Appellants.

Harned Pettus Hoose, Wayne I. McClaskey and Maurice L. Muehle for Appellants.

Womble, Carlyle, Sandridge & Rice, W. P. Sandridge, Gibson, Dunn & Crutcher, Sherman Welpton, Jr., F. Lee Coulter, Jr., O'Melveny & Myers, Philip F. Westbrook, Jr., and William W. Vaughn for Respondents.

DRAPEAU, J. pro tem.*—Piedmont Publishing Company, a North Carolina corporation, and Mary Pickford Rogers, star of silent pictures, were rival applicants for a license by the Federal Communications Commission for a television station in Winston-Salem, North Carolina.

Piedmont owned and published two newspapers in Winston-Salem, and also owned and operated a radio broadcasting station there.

Piedmont and Miss Pickford decided to pool their interests and organize a new corporation in North Carolina to apply for the license. They knew that only one license would be granted, and that a contest for it might take so long that a television station already licensed in Winston-Salem might capture the television audience. Then, whichever one, Piedmont or Miss Pickford, was awarded the license would have but a Pyrrhic victory.

So they organized a corporation under the laws of North Carolina—Triangle Broadcasting Corporation—to make the application.

Then Piedmont and Miss Pickford withdrew their applications.

But they didn't have the coveted license in their possession yet. A dark cloud appeared on the horizon. The owner of another radio station in Winston-Salem applied for a telecasting license, and they faced another long delay unless they could do something about it.

This obstacle was overcome by having Triangle agree to pay the new applicant $20,000 over a 12-month period, for advertising Triangle's television station by his radio station. For this he withdrew his application.

Then Triangle was awarded the license—station WSJS-TV.

Then Triangle was awarded an exclusive local contract with National Broadcasting Company.

Piedmont and Miss Pickford had been negotiating for some time before they came to an agreement. Miss Pickford was represented by a business adviser and a lawyer. These men did the actual, face-to-face negotiating.

Before the agreement was put into writing, incorporation

*Assigned by Chairman of Judicial Council.

of Triangle was commenced, as speed in getting the application before the Federal Communications Commission was essential.

Piedmont and Miss Pickford signed the agreement in New York May 25, 1953.

Piedmont subscribed for 1,000 shares of Triangle's stock, for which it later paid $100,000.

Miss Pickford subscribed for 500 shares, for which she later paid $50,000.

Expressed in fractions, Piedmont subscribed and paid for two-thirds, and Miss Pickford one-third of Triangle's stock. And that is all the stock ever issued by Triangle.

The agreement gave Piedmont an option to purchase Miss Pickford's stock at the end of any one of Triangle's fiscal years 1956, 1957, 1958, and 1959. The price Piedmont was to pay for the stock was determined by a formula to be used by Triangle's "regularly employed independent certified public accountants."

The agreement also provided that if Piedmont did not exercise its option within the fiscal years stated, Miss Pickford was to have an option to purchase one-half of Piedmont's stock in Triangle.

Controversy over the enforcement of Piedmont's option is the basis of this lawsuit.

The formula to determine the purchase price to be paid by Piedmont for the Pickford stock was as follows:

An amount per share of stock equal to the sum of the two following items, divided by the number of outstanding shares of the corporation:

1. An amount equal to the total book value at the beginning of any such period of Triangle's common stock (total amount of issued and outstanding common stock at par plus the amount of earned and other surplus or less the amount of deficit, if any) adjusted to reflect an annual depreciation and obsolescence charge of not over 10 per cent against such tangible assets as have been depreciated on the books of Triangle at a higher rate; and

2. An amount determined by multiplying the average net annual profits of Triangle by five.

Five was the multiplier agreed upon for 1956, the year in which Piedmont exercised its option. If the option had been exercised in 1957 it would have been four; in 1958 three; and in 1959 two.

"Average annual net profits" was defined as follows:

"Average annual net profits shall be determined by dividing the number of fiscal years for the period involved, as described in column (2) above, into the sum of the annual net profits during such fiscal years less the sum of the annual net losses, if any, during such fiscal years, as shown by the annual financial reports of Triangle as prepared by Triangle's regularly employed independent certified public accountants, and after provision for all taxes, including federal and state income and excess profits taxes."

In 1954 Miss Pickford transferred to her husband, Charles Buddy Rogers, 225 of her 500 shares of Triangle stock. Piedmont approved of the transfer, as required by the agreement.

July 20, 1956, Piedmont exercised its option, and made a tender to the Pickfords of the purchase price, as computed by the accountants.

Thereafter Piedmont made many unsuccessful attempts to induce the Pickfords to comply with the option—by correspondence, telephone calls, and telegrams, and finally by a trip by its officers to California to see them personally.

April 16, 1958, Piedmont brought this action for specific performance and for declaratory relief, naming as defendants Mary Pickford and her husband, Charles Buddy Rogers.

The case was tried on plaintiff's first amended complaint.

The amended complaint alleged that Triangle's "regularly employed independent certified public accountants" applied the formula in the option, and determined that the purchase price of the Pickford-Rogers stock was $85,461; also that because of unusual expenditures caused by relocating Triangle's transmitting station, plaintiff had concluded that the Pickfords were entitled to an additional sum of $41,351.36, which they had "voluntarily and gratuitously" tendered to them.

This additional tender was made for the following reasons:

After the station commenced telecasting, it became apparent that a change of location of its transmitter to higher ground was desirable.

The station would then be able to transmit better signals for greater distances. More listeners would be brought within its range. And the station would become a better medium for its advertisers.

So they moved the transmitter to the top of a mountain, from where it had been located at a place called Kernersville.

The cost of moving the transmitter caused losses to be shown on Triangle's books that materially cut down the option price, as computed under the formula.

The sum of the two offers is $126,812.36.

Defendants alleged in their answer that the purchase price computed by Triangle's accountants was grossly inadequate and unfair; that the formula was not properly applied; that the court was without jurisdiction in that Triangle, an indispensable party, and Gordon Gray, principal stockholder of Piedmont, were not before the court; and, furthermore, that plaintiff did not appear in a court of equity with clean hands.

Defendants also cross-complained, naming as cross-defendants: Piedmont, Gordon Gray, William K. Hoyt, Harold Essex, Triangle, Ernst & Ernst, Harry Borthwick, and others.

Triangle and Mr. Gordon Gray were not served with summons, and did not appear in the action. Mr. William L. Maynard was served in place of a fictitious defendant.

Mr. Gordon Gray is principal stockholder of Piedmont. Mr. Hoyt is president and director of Piedmont and Triangle. Mr. Essex is executive vice president of Triangle, and director of Piedmont and Triangle. Mr. Maynard is supervising controller of Piedmont and Triangle; but Piedmont pays his salary.

Ernst & Ernst is a partnership of certified public accountants, with offices in a number of cities in the United States. It has, however, been a long time since anyone by the name of Ernst has been a member of the partnership.

Mr. Harry Borthwick is resident partner of Ernst & Ernst in Winston-Salem. He computed the option price, after consulting with an associate in New York.

Defendants again alleged in their cross-complaint that the Superior Court of the State of California was without jurisdiction, in that Triangle was an indispensable party to the action and was not before the court as a party plaintiff or defendant.

This contention has been urged all through this case, and is a principal ground of appeal.

Demurrer on the ground that Triangle was an indispensable party was interposed to the first amended complaint, and overruled; formal motion for an order joining Triangle as an indispensable party, together with Gordon Gray, was made, and denied; petitions for a writ of prohibition were made in the District Court of Appeal and in the Supreme Court of California, and denied; motion was made at the beginning of

the trial in the superior court, and denied; officers of Triangle sojourning in Los Angeles were served with summons to Triangle to appear in the action, and the summons was quashed; and motions to have attorneys for Piedmont removed as attorneys for Triangle, when it specially appeared to move to quash the summons, were denied.

No one can say that counsel for the Pickfords has not diligently presented this contention to the courts.

The other issues may be briefly stated:

Piedmont asserts that the conditions of the option have been fully complied with.

Defendants assert·that the conditions of the option have not been complied with; that a wrong amount was tendered for the purchase price of the stock, and part of that amount was withdrawn; that the computations under the formula were tainted with fraud, misrepresentations, and negligence of cross-defendants, who were fiduciaries of the Pickfords and trustees for them in Triangle. That in the computation wrong annual depreciation was applied, obsolescence greatly in excess of 10 per cent per annum was claimed, average net profits were compressed, fictitious taxes were used, and the accountants were in fact not independent, but were dictated to by Piedmont and Gordon Gray in the computation of the option price.

The court found, among other things:

1. That neither Triangle nor Gordon Gray were indispensable or conditionally necessary parties to this action.

2. That there was a good and valid option, Pickford to Piedmont, on the terms and conditions heretofore stated in this opinion.

3. That there was no unfair or inequitable conduct or improper dealing between Piedmont and Triangle.

4. That Piedmont decided to exercise its option and requested Ernst & Ernst to compute the option price; that Ernst & Ernst computed the price for the Pickford-Rogers stock to be $85,461.

5. That book losses due to change of location of Triangle's TV transmitter should not have been included in the computation of the option price; and, therefore, Ernst & Ernst properly made a further computation of an additional $41,357.36, to be added to the $85,461, or a total of $126,812.36.

The trial court directed that $6,431.59 be added to $126,812.36 as a condition of granting specific performance. This made the total judgment $133,243.95,

The additional $6,431.59 included:

a. Charges for advertising in the radio station that withdrew its application. The accountants spread these charges over two fiscal years. The trial court directed that they be written off over a period of five years.

b. A duplication of charges for vacation pay, and

c. Charges for items of depreciation greater than the 10 per cent limitation in the agreement.

6. That Piedmont exercised its option in good faith, but defendants refused to deliver the stock, and plaintiff is entitled to specific performance of the option.

7. That Triangle's accountants, Ernst & Ernst, correctly interpreted the option, and properly applied the formula for the purchase price of the stock, except as to the $6,431.51 added by the trial court.

8. And that there was no fraud, collusion, or unfair dealing in the application of the formula.

Piedmont delivered to the clerk of the superior court certified checks for the amount added. These checks, and checks for the rest of the purchase price, and the Pickford-Rogers stock, are in the custody of the clerk of the superior court.

Defendants appeal from the judgment on the complaint; from the judgment on the cross-complaint; and from the order on defendants' motion to tax costs.

## Grounds of Appeal

Appellants contend it was error:

1. To proceed with the case in the absence of Triangle, an indispensable party.

2. To adjudge specific performance of Piedmont's option, because at no time did Piedmont tender or offer a correct and adequate price for the stock; nor did Piedmont perform conditions precedent to the exercise of the option.

3. To adopt the accountants' computation of the option price, and to find that they were independent, when in fact they were not, and when in fact they had supplied advance secret computations and aided and assisted Piedmont before the exercise of the option, all without the knowledge of the Pickfords.

4. To fail to find on substantial issues, to make findings without evidentiary foundation, and to make conflicting findings.

5. To quash summons served upon officers of Triangle.

6. To allow costs to cross-defendants, and extra costs to defendants for depositions.

7. To deny appellants' motions:

a. To admit evidence of fraud and negligence against cross-defendants.

b. To strike testimony of respondents' expert witness on accounting.

c. To include on the trial all the evidence on the motion to quash summons.

d. To require counsel for Piedmont disqualified to appear specially for Triangle, or to withdraw as counsel for Piedmont.

e. To have Harry Borthwick produced as a cross-defendant sufficiently early in the trial to make his testimony under Code of Civil Procedure, section 2055, of any value to appellants.

8. To grant, prejudicially late, appellants' motion to file amendment to answer to cross-complaint.

### Is Triangle an Indispensable Party?

We find the basic law to answer this question in section 389 of the Code of Civil Procedure, as amended in 1957.

"A person is an indispensable party to an action if his absence will prevent the court from rendering any effective judgment between the parties or would seriously prejudice any party before the court or if his interest would be inequitably affected or jeopardized by a judgment rendered between the parties.

"A person who is not an indispensable party but whose joinder would enable the court to determine additional causes of action arising out of the transaction or occurrence involved in the action is a conditionally necessary party."

In the well-considered case of *Bank of California* v. *Superior Court,* 16 Cal.2d 516 [106 P.2d 879], Mr. Chief Justice Gibson, speaking for a unanimous Supreme Court, clearly stated the rule. ■ After tracing the history from common to modern law of the doctrine of indispensable and necessary parties, the court says [p. 521]:

"First, then, what parties are indispensable? There may be some persons whose interests, rights, or duties will inevitably be affected by any decree which can be rendered in the action. Typical are the situations where a number of persons have undetermined interests in the same property, or in a particular trust fund, and one of them seeks, in an

action, to recover the whole, to fix his share, or to recover a portion claimed by him. The other persons with similar interests are indispensable parties. The reason is that a judgment in favor of one claimant for part of the property or fund would necessarily determine the amount or extent which remains available to the others. Hence, any judgment in the action would inevitably affect their rights. Thus, in an action by one creditor against assignees for the benefit of creditors, seeking an accounting and payment of his share of the assets, the other creditors were held indispensable (*McPherson* v. *Parker,* 30 Cal. 455 [89 Am.Dec. 129]) ; and in an action by plaintiff to enforce a trust, where he claimed the property in his own right, to the exclusion of another actual beneficiary, failure to join the latter was held fatal to the judgment. (*O'Connor* v. *Irvine,* 74 Cal. 435 [16 P. 236].)

"Where, also, the plaintiff seeks some other type of affirmative relief which, if granted, would injure or affect the interests of a third person not joined, that third person is an indispensable party. Thus in an action by a lessor against a sublessee to forfeit a parent lease because of acts of the sublessee, the sublessors (original lessees) were indispensable parties, since a decree of forfeiture would deprive them of their lease. (*Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal.2d 232 [73 P.2d 1163].) And in a suit to cancel illegal registration of voters, all voters whose registration was challenged were indispensable parties. (*Ash* v. *Superior Court,* 33 Cal.App. 800 [166 P. 841].) Many other cases, illustrating the reasons for compulsory joinder, may be found. [Citing cases.]

"All of these persons are, of course, 'necessary' parties, but the decisions show that they come within a special classification of necessary parties, to which the term 'indispensable' seems appropriate. An attempt to adjudicate their rights without joinder is futile. Many cases go so far as to say that the court would have no jurisdiction to proceed without them, and that its purported judgment would be void and subject to collateral attack. The objection being so fundamental, it need not be raised by the parties themselves; the court may, of its own motion, dismiss the proceedings, or refuse to proceed, until these indispensable parties are brought in. [Citing cases.] It follows that if the court does attempt to proceed, it is acting beyond its jurisdiction and may be restrained by prohibition.

"The other classification includes persons who are

182

interested in the sense that they might possibly be affected by the decision, or whose interests in the subject matter or transaction are such that it cannot be finally and completely settled without them; but nevertheless their interests are so separable that a decree may be rendered between the parties before the court without affecting those others. These latter may perhaps be 'necessary' parties to a complete settlement of the entire controversy or transaction, but are not 'indispensable' to any valid judgment in the particular case. ■ They should normally be joined, and the court, following the equity rule, will usually require them to be joined, in order to carry out the policy of complete determination and avoidance of multiplicity of suits. But, since the rule itself is one of equity, it is limited and qualified by considerations of fairness, convenience, and practicability. Where, for example, it is impossible to find these other persons or impracticable to bring them in, the action may proceed as to those parties who are present.''

■ Applying the rule as stated, it becomes manifest that in this action to enforce an option for the purchase and sale of part of its stock, the absence of Triangle will not prevent the rendition of an effective judgment between Piedmont and the Pickfords; nor will the absence of Triangle prejudice either the Pickfords or Triangle; nor inequitably affect or jeopardize the interests of any of them.

The law does not make a corporation whose stock is the subject of an option of purchase and sale a necessary or indispensable party in an action between optioner and optionee to enforce their contract.

The illustration in Piedmont's brief may perhaps be oversimplified: e.g., if A gives B an option to purchase stock in a domestic corporation, that corporation most certainly is not an indispensable party if B brings suit to enforce his option.

An illustration more nearly in conformity with the facts in this case would be an option to sell stock in a corporation by A to B, with a provision that the option price would be determined by the book value and annual profits of the corporation divided by the number of its shares. In such a case it seems clear that the corporation is neither a necessary nor indispensable party to an action to enforce B's option.

Therefore, we have concluded that under the facts in this case, Triangle is neither an indispensable nor conditionally necessary party. (*Sayward* v. *Houghton,* 82 Cal. 628 [23 P. 120]; *Hays* v. *Cowles,* 60 Cal.App.2d 514 [141 P.2d 26].)

### Did Piedmont offer a correct and adequate price for the Pickford stock?

Let us first review the offer and some of the testimony as to value.

| | |
|---|---:|
| The accountants computed the option price at ... | $ 85,461.00 |
| Then they added because of the Kernersville losses | 41,357.36 |
| The total of these two amounts found by the trial court to have been tendered, was | 126,812.36 |
| To this the court added | 6,431.59 |
| Total adjudged price to be paid for the Pickford stock | $133,243.95 |

At the trial, a witness testified that the market value of Triangle's television station when the option was exercised was $1,270,548.23.

This would make the Pickfords' one-third interest in Triangle worth something more than $400,000.

An objection was sustained to offered testimony that the value of the television station April 30, 1958, was approximately $2,400,000.

It follows that in computing the option price neither the accountants nor the trial court included good will in "total book value" as used in the formula.

Component parts of that good will would be:

a. The fair market value of the telecasting license, which the parties worked so hard to secure.

b. The fair market value of the television station, as its listening audience grew in numbers, and as the value of its advertising contracts consequently became greater.

c. The fair market value of Triangle's contract with National Broadcasting Company.

This feature of this case has not been argued by counsel for any side, except inferentially.

Such research as we have been able to make discloses that there is at least one case in California dealing with the legal meaning of the term "good will."

In *Lassallette* v. *Parisian Baking Co.*, 110 Cal.App.2d 375 [242 P.2d 671], the District Court of Appeal of California dealt with the meaning of the words "book value" in a by-law of the defendant corporation, used to compute the sale price of its stock.

In that case the by-law fixed $25,000 as the value of the good will of a bakery business.

Referring to the legal meaning of "book value" the court said [p. 377]: "In conducting this inquiry we must bear in

mind the fact that the law does not define 'book value' as denoting a particular method of arriving at the value of fixed or other assets of a corporation. It may be market value, cost less depreciation, or other concept of value recognized by sound accounting practice and used by the particular corporation in recording its financial transactions. (See discussion in Ballantine, California Corporation Laws, 1949 ed., p. 185, § 137, and authorities cited.)''

In the case we are now considering it is conceded that the laws of North Carolina govern in the construction of the agreement containing the option.

Such research as we have been able to make leads us to the opinion that there is little difference between the laws of North Carolina and of California, with respect to the use of the term ''book value'' as used in contracts, and that the decisions of the courts of both states are practically the same.

In the case of *Gurley* v. *Woodbury*, 177 N.C. 70 [97 S.E. 754], the Supreme Court of North Carolina was concerned with the words in a contract ''actual book value of stock.''

The court said: ''The meaning of 'book value of stock' is well understood and is ascertained by deducting from the assets, carried on the books, the liabilities and other matters required to be deducted [citing cases], and if the contract stopped here there would be good reason in support of the defendant's contention that he is entitled to a credit of $125 per share; but it goes further, and says it is the book value 'as shown by the records and books of said bank.' ''

Again the North Carolina court observes: ''The use of the word 'actual' before 'book value' is also significant. Webster defines 'actual' as 'real,' and when used as it is in the contract, and considered in connection with the surrounding circumstances, it indicates clearly that the parties intended, by 'actual book value,' the assets less liabilities carried on the books, with the items of assets, condemned by the Comptroller, stricken out, and this is the opinion held by his honor and embodied in his judgment.''

In *Spreckels-Rosekrans Inv. Co.* v. *Lewis*, 146 F.2d 982, the court said: ''It is common knowledge that book values assigned to corporate assets are often arbitrary and are generally unreliable. Only an appraisal of the actual asset values would enable the net worth of the two corporations to be computed.''

In the case of *Hollister* v. *Fiedler*, 22 N.J. Super. 439 [92 A.2d 52], the court was called upon to decide whether or not the value of lists of expirations, or records of renewal dates,

of insurance policies should have been included in the computation of the book value of corporate shares. This was required under an option given a surviving shareholder to purchase stock of a deceased shareholder.

The Appellate Court of New Jersey held that it was the intention of the parties by their agreement to include the value of the lists in computing the option price.

The court said: "The meaning to be attributed to the words 'book value' depends upon the construction of the specific language used in the particular instrument wherein that term is stated. In Black's Law Dictionary (4th ed. 1951), 'book value' is defined: 'As applied to stock, the value shown by deducting liabilities and other matters required to be deducted from assets, *Elhard* v. *Rott*, 36 N.D. 221 [162 N.W. 302]; *Gurley* v. *Woodbury*, 177 N.C. 70 [97 S.E. 754].'

"5 Words and Phrases, defines 'book value' as: ' "Book value" of stock is not any arbitrary value that may be entered upon books of a corporation, but value as predicated upon market value of assets of the corporation after deducting its liabilities. *Townsend* v. *La Crosse Trailer Corp.*, 254 Wis. 31 [35 N.W.2d 325, 328].' "

Again the New Jersey court said: ". . . in the absence of express language excluding this asset from the computation of stock value the result is an inaccurate result unintended by the parties and works an inequitable result upon the parties. It is a rule of construction that the presumptions are in favor of reasonableness and against the imputation of hardship and inequities and preponderate in fairness to the contracting parties."

In *Townsend* v. *La Crosse Trailer Corp.*, 254 Wis. 31 [35 N.W.2d 325], the Supreme Court of Wisconsin defined "book value" as follows:

"The book value is not any arbitrary value that may be entered upon the books of the company but the value as predicated upon the market value of the assets of the company after deducting its liabilities [citing cases]." See also *Rubel* v. *Rubel*, 221 Miss. 848 [75 So.2d 59, 47 A.L.R.2d 1410], and *Brennan* v. *Brennan*, 164 Ohio 29 [128 N.E.2d 89, 50 A.L.R.2d 1259].

When we come to the question whether or not good will must be included in book value, we find the decisions in conflict.

In *Early* v. *Moor*, 249 Mass. 223 [144 N.E. 108, 33 A.L.R. 362], it was held that unless good will was included in an

agreement for sale of corporate stock it was not included in the term book value.

But in *Lindsay's Estate*, 210 Pa. 224 [59 A. 1074], the court took a contrary view. The agreement in that case speaks of the book value, and also the fair value, of the stock.

The court said: "It is therefore manifest, as stated by the court below, that the contemplation of the parties was a fair value of the stock as a basis upon which it could be taken, and whatever contributes to such value must be taken into consideration as an element of it. It is a matter of common knowledge that, beyond the actual value of the tangible assets of a successful partnership or corporation, there is also a substantial value in the patronage enjoyed, due to the reputation of the firm or company for excellence in its business. Such value is recognized by the law as good will."

In California "good will" is defined by section 14100 of our Business and Professions Code: "The 'good will' of a business is the expectation of continued public patronage."

■■■ In the case of *In re Lyons*, 27 Cal.App.2d 293, at page 297 [81 P.2d 190], is to be found a more complete definition: "Good will has been defined 'to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances, or necessities, or even from ancient partialities or prejudices. (Story on Part., § 99.) . . . According to Lord Eldon it is the probability that the old customers will resort to the old place. It is the probability that the business will continue in the future as in the past, adding to the profits of the concern and contributing to the means of meeting its engagements as they come in.' "

The business of a corporation is recognized as distinct from its other property. (*Shaw* v. *Hollister Land & Imp. Co.*, 166 Cal. 257 [135 P. 965].)

See also *Smith* v. *Bull*, 50 Cal.2d 294 [325 P.2d 463]; *Bergum* v. *Weber*, 136 Cal.App.2d 389 [288 P.2d 623]; *Burton* v. *Burton*, 161 Cal.App.2d 572 [326 P.2d 855].

The rules of construction of contracts are well settled.

It was stated in the very early case of *Nash* v. *Towne*, 5 Wall. (U.S.) 689 [18 L.Ed. 527], as follows: "Courts, in the construction of contracts, look to the language employed, the

subject-matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and, in that view, they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and of the correct application of the language to the things described."

In California the rules have been stated many times.

"[E]very provision of a contract should be examined to determine the meaning and intention of the parties. . . . [T]he meaning of words contained in a contract is to be determined not from a consideration of the words alone but from a reading of the entire contract." (*Sunset Securities Co.* v. *Coward McCann, Inc.,* 47 Cal.2d 907, 911 [306 P.2d 777].)

"The object and meaning of the parties' contract must be determined by their intent at the time of its execution." (*Houge* v. *Ford,* 44 Cal.2d 706, 713 [285 P.2d 257].)

"In the interpretation of any written instrument, the primary object is to ascertain and carry out the intention of the parties." (*New York Life Ins. Co.* v. *Hollender,* 38 Cal. 2d 73, 81 [237 P.2d 510].)

"Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution—including the object, nature, and subject matter of the agreement [citation]—as well as to subsequent acts or declarations of the parties 'shedding light upon the question of their mutual intention at the time of contracting.'" (*Barham* v. *Barham,* 33 Cal.2d 416, 423 [202 P.2d 289] ; *Taylor* v. *Selig,* 28 Cal.2d 634 [170 P.2d 913].)

"The fundamental canon of construction which is applicable to contracts generally is the ascertainment of the intention of the parties. (Civ. Code, § 1636.) . . .

"As an aid in discovering the all-important element of intent of the parties to the contract, the trial court may look to the circumstances surrounding the making of the agreement [citing cases], including the object, nature and subject matter of the writing [citing cases], and the preliminary negotiations between the parties [citing cases], and thus place itself in the same situation in which the parties found themselves at the time of contracting. [Citing cases.]" (*Uni-*

*versal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 760, 761 [128 P.2d 665].)

Let us now consider the agreement, the circumstances surrounding its making, and what happened afterwards, to see what the contracting parties intended to include in their formula to compute the option price of the stock.

They used the words "total book value" in the formula.

Webster's New International Dictionary, 2d edition, defines the word "total" as follows:

"1. Of, pertaining to, or referring to the whole of a thing, specified or implied, or the entire number of things concerned; not partial; as a total eclipse or wreck.

"2. Comprising or constituting a whole, or the sum of all parts, items, instances, etc., entire; the total amount, revenue, output, disbursements, mileage, or membership."

So we think the conclusion necessarily follows that by adding the word "total" to "book value" the parties meant to include the value of Triangle's intangible assets—the license to telecast, the advertising value of the station, and Triangle's contract with National Broadcasting Company.

When they provided a limitation of 10 per cent on charges for depreciation and obsolescence in clause 1 of the formula, they used the words "against such *tangible* assets as have been depreciated on the books of Triangle at a higher rate." (Emphasis added.) This language indicates that they had in mind not only tangible but intangible assets as well.

The method of accounting points to the same conclusion.

For example, take the item of $20,000 paid for advertising to the radio man who made and withdrew his application for the television license. This was charged on Triangle's books to "expense." That charge on the books, like the Kernersville charge, affected the option price, and reduced it $6,666.67.

We do not believe that gentlemen in control of Piedmont's policies, with their standing in their community and state, meant to use an accounting method that would cut down the fair value of Miss Pickford's stock, if they exercised their option. We think, rather, they intended to pay her a fair price for her participation in securing the television license, and in making the television station an outstanding success.

Sounder and safer principles of equity and fair dealing dictate the conclusion that when the contract was made every one intended to include the value of the good will of the television station, as we have defined it, in computing the price of the Pickford stock when the time came for Piedmont to

exercise its option; or if Piedmont did not exercise its option, the price Miss Pickford was to pay if she exercised her option.

The Piedmont people and Miss Pickford combined their interests and applied jointly for a federal license because they feared a competing station would capture the television audience while they were engaged in a long procedure before the Federal Communications Commission on contested applications. They joined in a business enterprise that would have been worthless without an audience for the television station.

As the audience grew, the advertising worth of the station and of its earnings increased enormously. One of the primary purposes of the venture was to secure, and then to build up these elements of good will.

After the station was in operation, the relocation of the Kernersville transmitter evidenced the major purpose of all concerned—to expand their television audience, to increase the advertising value of their telecasting station, and thus to increase the value of these intangible but nonetheless real assets of good will.

So when Piedmont determined to exercise its option, every one recognized the inequity of the accountants' computation of $85,561 as the option price. They knew it wasn't fair to include the Kernersville losses in the computation.

It wasn't fair because while that expenditure increased the value of the television station, the accountants gave the Pickfords no credit for it. Instead, they charged them for the cost of moving the transmitter. They transferred value to the intangible asset of good will of the television station, and reduced book profits that would otherwise have been used to compute the option price, using the multiplier.

The "gratuitous" offer of an additional $41,357.36 emphasizes the point. Piedmont's directors' minutes recite that its officers and directors doubted whether under all the circumstances it was within the spirit of the contract of May 25, 1953, to charge these losses as expenses in the fiscal year ending April 30, 1956, and requested Ernst & Ernst to make the further computation. They struck at the effect of the Ernst & Ernst computation but failed to perceive the cause.

And the way Piedmont treated this item becomes in our opinion a weighted factor for the consideration of a court of equity called upon to say what the parties meant to include in the formula.

The definition of "total book value" contained within the parentheses in clause 1 of the formula—"(total amount of

earned and other surplus or less the amount of deficit, if any)''
—also supports this construction. The words ''other surplus''
again indicate that the parties intended to include intangible
as well as tangible assets.

Mr. Borthwick testified that there was no ''other surplus''
shown in any of the financial statements of Triangle.

Ballentine defines ''surplus'' as: ''The term 'surplus'
means the excess of assets at book value (all proper deductions
having been made), over liabilities plus stated capital.'' (Bal-
lentine, 1949 ed., § 136, p. 184.)

Mr. Borthwick testified that in computing the option price
he gave no consideration to the intangible items of value we
have been talking about.

He testified: ''Q. Will you state your reasons therefor?
A. Yes, because it was not purchased. Such things, if pur-
chased, might be added to the assets as an intangible asset,
but since they were not purchased or bought or paid for, there
is no requirement in generally accepted accounting principles
that they be entered in the books, and in fact, quite the con-
trary.''

This accounting principle is stated in section 137, page 185,
1949 edition of Ballentine, as follows:

''The question is unsettled whether good will may be put
on the books of a corporation after the corporation has been
doing business for several years without a capitalized good
will. Accountants generally take the position that good will
should not be carried upon the books unless it was acquired
by purchase from a going concern. It is doubtful whether an
increased value of good will may be entered upon the books
due to increased earning capacity. In general the entering of
appreciation in value, whether of tangible or intangible assets,
is frowned upon.''

But we are not dealing here with rules for accounting in
corporate bookkeeping. Our problem here is to determine
what the parties meant to include in their formula.

That problem is one of law and fact, and is not to be deter-
mined solely upon principles of accounting.

We include the value of the telecasting license, the value of
the television station, and the value of the National Broad-
casting Company contract in the term ''total book value'' as
used in the formula for the purposes of this case only. We
do not hold that good will must necessarily include such items
in all corporate accounting. As stated in the Lassallette case,
*supra,* 110 Cal.App.2d 375, the law does not define ''book

value'' as denoting any particular method of arriving at the value of assets of a corporation. [P. 377.]

So we conclude that it was the intention of the parties when they used the words ''total book value'' in their agreement, to include the value of the telecasting license, the increasing value of the television station, and the value of the National Broadcasting Company contract in computing the option price.

Therefore, the decision of the trial court must be modified in this respect, and the case referred to the superior court for further proceedings to compute the total book value of the Pickford-Rogers stock, as we have construed the formula.

This means, of course, the value at the time the option was exercised.

The case is to be retried on the sole issue of the fair market value of the total good will of Triangle, as we have defined its three component parts, viz:

1. The fair market value of the telecasting license.

2. The fair market value of the television station.

3. The fair market value of the contract with National Broadcasting Company.

We agree with the trial court's finding that the option price, not including the items of good will specified, was $133,243.95.

To that sum shall be added one-third of the value of these three items of good will, to be ascertained by the superior court, and the total sum shall be adjudged to be paid to the Pickfords as a condition of specific performance.

All other findings are approved and affirmed.

We agree with the trial court that there was no fraud, or fraudulent conduct of the accountants, or of the officers of Piedmont or of Triangle, or of any of them, or of any cross-defendant.

Respondents cite a number of authorities to the effect that the computation of the option price by the independent certified public accountants was conclusive and binding upon the parties to the agreement.

This rule, however, is always qualified by the reservation ''in the absence of fraud or mistake,'' and in our view is not applicable under the facts in this case. (*California Sugar etc. Agency* v. *Penoyar,* 167 Cal. 274 [139 P. 671].)

### Questions as to Tender

Admittedly plaintiff did not tender the amount adjudged by the trial court to be paid to the Pickfords. $6,431.59 was added as a condition of specific performance.

Appellants' argument that Piedmont's offer of $41,351.36 was withdrawn is not tenable. This was the item of Kernersville losses. All that plaintiff did was to ask in its cause of action for declaratory relief to have the courts adjudge the status of that part of its offer.

As we hold that good will was a part of "total book value" as used in the formula, the tender in any event was insufficient.

But that does not require us to reverse and send the whole case back for retrial.

We do not hold that the tender was in any respect tainted with fraud, or unfair dealing. It was made in good faith, and it was the result of a mistake of the accountants in their construction and application of the formula.

The mistake was capable of being fully compensated for (Civ. Code, § 3392), and under the modern doctrine of substantial performance (12 Cal.Jur.2d, § 221, p. 443, and cases cited), the insufficient tender was not fatal to plaintiff's cause of action for specific performance of the option. It is the usual practice of courts of equity to enforce specific performance of contracts of this kind upon application of the party who has substantially complied with their stipulations.

Therefore, we will dispose of appellants' other grounds of appeal.

### The Findings

We have read the reporter's transcript, and find substantial evidence that supports all of the findings, except those as to computation of the purchase price of the stock.

There was no failure to find on any substantial issue. There were no conflicting findings fatal to the judgment on the complaint, or to the judgment on the cross-complaint, with the one exception stated.

The rules on appeal as to findings are fully stated in the recent case of *Brewer* v. *Simpson,* 53 Cal.2d 567, at page 583 [2 Cal.Rptr. 609, 349 P.2d 289].

### Other Asserted Errors

It was not error:

(a) to quash the summons served upon officers of Triangle; or

(b) to refuse to hold counsel for Piedmont disqualified to appear specially for Triangle; or to refuse to order them to withdraw as counsel for Piedmont; or

(c) to have the witness Harry Borthwick produced as a cross-defendant at an earlier date in the trial; or

(d) to grant, prejudicially late, appellants' motion to file amendment to their cross-complaint.

The last two specifications of error come within the rule stated in *Fuchs* v. *Southern Pacific Co.*, 5 Cal.App.2d 409 [42 P.2d 704], that it is always within the sound discretion of a trial judge to regulate the order of proof.

We find no abuse of discretion in allowing costs to cross-defendants, and extra costs on depositions. (Code Civ. Proc., § 1032; 12 Cal.Jur.2d, Costs, § 5, p. 224.)

None of appellants' asserted errors as to rulings on evidentiary matters is tenable.

### The Cross-Complaint

The record supports the trial court's findings that there was no fraud or negligence of any of the cross-defendants. No one of them was guilty of chicanery or unfair dealing.

As we have held, there was a mistake in computing the option price, based upon the erroneous construction of a legal document by accountants. Such mistakes are neither unusual nor reprehensible; although sometimes they are as disconcerting to the legal mind as the discovery of a pebble in a piece of apple pie.

As counsel for Ernst & Ernst say in their brief, accountancy is more of an art than an exact science, and "the judgment, skill, and experience of one accountant may lead him to a conclusion different from that reached by another accountant, and it would be impossible for a third accountant to say either was wrong." (Citing *Sanitary Farm Dairies* v. *Gammel*, 195 F.2d 106.)

And when the officers of Piedmont and Triangle began to figure on the price of the Pickford stock fixed by the option, they too found areas of disagreement.

Mr. Hoyt testified that Ernst & Ernst made the first tentative computation under the formula, and interpreted clauses 1 and 2 of the formula in one way. "Then they came back with a question that they didn't believe this was the meaning of the contract."

Mr. Hoyt also testified that he and Mr. Sandridge agreed on one method of computation; that Mr. Essex disagreed; and finally "convinced me I was wrong."

We think the judgment on the cross-complaint should be affirmed.

The judgment on the amended complaint is affirmed, and modified, with directions to the superior court to ascertain and

declare the fair market value of the intangible elements of total good will in the option, to add one-third of that sum to $133,243.95, and to adjudge that the total thereof shall be paid to the Pickfords as a condition of specific performance—all in accordance with the views hereunder expressed.

The judgment on the cross-complaint is affirmed.

And the order on the motion to tax costs is affirmed.

All parties, plaintiff, defendants, and cross-defendants shall bear their own costs on appeal.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied July 17, 1961, and respondents' petition for a hearing by the Supreme Court was denied August 16, 1961. Traynor, J., was of the opinion that the petition should be granted.