[Civ. No. 8828.   Fourth Dist., Div. One.   Dec. 13, 1968.]

A. B. POLINSKY, Plaintiff and Appellant, v. CLARENCE
M. VAUGHAN et al., Defendants and Respondents.

Scales, Patton, Ellsworth & Corbett and Lawrence A. Pat-
ton for Plaintiff and Appellant.

Rubin, Seltzer & Solomon, Herbert J. Solomon and Gerald
L. McMahon for Defendants and Respondents.

WHELAN, J.—Plaintiff appeals from a judgment denying
him specific performance of agreements that obligated defend-

ants to sell certain shares of stock to plaintiff for a price representing fair market value to be set by plaintiff's accountants.

One hundred forty-four of the shares involved were of Coca-Cola Bottling Company of the Valley (Valley) and 36 were of I-V Properties, Inc. (I-V). Valley held a franchise from Coca Cola Company (CCC) for the bottling and distribution of Coca Cola in Imperial County and a part of Riverside County; I-V owned a parcel of real estate in each of those two counties rented to Valley for use in the business.

Plaintiff, his son Charles Polinsky (Polinsky), his son-in-law Arthur Rivkin (Rivkin), and members of his family, in 1959 acquired control of the stock of Coca Cola Bottling Company of San Diego (CCSD), a corporation that held a franchise from CCC in San Diego County. Defendant Clarence M. Vaughan (Vaughan), who had been employed for 20 years by CCC, entered the employ of CCSD in 1959.

In January 1962, plaintiff, Polinsky and Rivkin purchased from the owner the franchise for Imperial County and a part of Riverside County and the other business assets of the sellers. Plaintiff and associates caused the newly acquired franchise and assets to be transferred to Valley, organized for that purpose, with the exception of the real property in Riverside County used in the business. That property was transferred to I-V, on whose books it was carried at a value of $24,000; the parcel of real property in Imperial County was acquired in the same year and transferred to I-V.

Three hundred thousand dollars was paid to the vendors, and $220,000 of vendors' liabilities were assumed and paid off within the first four years of the lives of Valley and I-V. The money for those purposes came from a $450,000 bank loan, and the sale of 300 shares of stock of I-V and 1,200 shares of Valley at the par value price of $100 per share. Plaintiff, Polinsky and Rivkin guaranteed payment of the bank loans and originally held all the shares of the two corporations, of each of which plaintiff held 25 percent. Of that 25 percent, plaintiff sold key employees of CCSD all but one percent; he sold Vaughan 12 percent of the authorized issue of Valley and I-V, with the requirement that plaintiff would have the right to purchase the stock in the event Vaughan should no longer be in the employ of either CCSD, Valley or I-V. That provision was embodied in two written agreements which, in relevant part, with appropriate changes as to the numbers of shares and the corporation's name, were as follows:

"In consideration of the sale of 144 shares of the common stock of Coca Cola Bottling Co. of the Valley, [36 shares of the common stock of I-V] evidenced by share certificate No. 6 of said corporation, for a consideration of $14,400.00 [$3,600], the undersigned jointly and severally agreed with A. B. Polinsky, the seller of said shares, that all of said shares shall be subject to the following rights and options in favor of A. B. Polinsky, his heirs, executors, administrators and assigns (hereinafter called 'A. B. Polinsky'), and that said rights and options shall constitute restrictions upon the further transfer of said shares:

"1. In the event that the undersigned, or either of them, shall desire to sell all or any of said shares, said A. B. Polinsky shall have the right and option to purchase the shares so offered for sale for the same price, and upon the same terms, as shall have been offered to the undersigned.

"2. In the event that the undersigned husband shall cease to be employed by either Coca Cola Bottling Co. of San Diego, a corporation, or Coca Cola Bottling Co. of the Valley, a corporation, for any reason whatsoever, then A. B. Polinsky shall have the prior right and option to purchase said shares for their fair market value as determined by the firm of Peat, Marwick & Mitchell, or its successors; provided, that the undersigned shall be paid no less than $100.00 per share for said shares:

"The foregoing restrictions shall apply to said shares in the event of a gift or bequest thereof by the undersigned and shall follow said shares into the hands of a donee or legatee."

Peat, Marwick, Mitchell & Company at all times since prior to November 1962 has been the firm of certified public accountants servicing plaintiff and CCSD, of which defendants at all times since prior to November 1962 had full and complete knowledge.

Vaughan paid $18,000, the par value of the shares in both corporations.

After giving written notice in November 1965, Vaughan, in the first two weeks of December, voluntarily terminated his employment with CCSD to work for a competitor of CCC. Before doing so, he orally communicated to Rivkin his desire to sell his shares in Valley and I-V to a third person at the price for which Vaughan said the third person had made an offer, approximately $60,000.

Vaughan received two written offers to purchase his shares. Respectively, they were dated December 21, 1965 and Decem-

ber 24, 1965, over the signatures of the step-son and wife of a friend and business associate, for $333 and $328 per share, payable over a period of years, with final payments on December 30, 1977 and December 30, 1975, with slight variations as to the amount of down-payments and interest rates. The offers stated they were accompanied by checks for $500 and $1,000 respectively, which were not enclosed.

Mrs. Vaughan receipted for the Polinsky acceptance of the option on December 23, 1965. Under that date Vaughan wrote Polinsky that Vaughan had received the offer for $333 per share and that it was accompanied by a $500 deposit.

On December 21, 1965, plaintiff exercised his option under paragraph 2 of the agreements by giving defendant Vaughan written notice thereof.

The present action was commenced on December 31, 1965, after plaintiff had requested Peat, Marwick & Mitchell (PM&M) to determine the value of the shares.

Prior to trial, PM&M placed a value of $110.66 per share on the shares of both Valley and I-V.

Carl Esenoff, of PM&M, testified as to the factors entering into the valuations and the methods employed. The accountant had employed three factors in making the evaluation: book value, average annual net earnings and average gross sales. The third factor was used to reflect the value of the good will and the franchise from CCC, which were not included as assets in the books of the company.

The book value, considered by the accountant to be the net equity value, was adjusted upwards to offset excessive depreciation that had been claimed for income tax purposes; thus adjusted the book value was $175,000 for both corporations. However, there was no current appraisal of the underlying assets and the good will and franchise from CCC had no value assigned to them on the books of the company.

A valuation reflecting price (per share) in relation to earnings (price-earnings ratio) was based upon a relatively arbitrary ratio of eight times the average annual earnings over the last two years of operation (January 31, 1964 to January 31, 1966). The ratio was adopted after studying market prices of shares in companies engaged in the beverage bottling business whose shares were sold in the open market, and in corporations engaged in unrelated businesses.

The total value of all shares of both corporations based upon the price-earnings ratio was $172,000.

In order to reflect the elements of good will and efficient

management not included in book value, the third approach based upon gross sales would show the progressive growth of the company by comparing the amount of gross annual sales when the business was taken over by plaintiff and his associates with such gross annual sales near the critical date.

The valuation based upon gross sales was arrived at by multiplying a price-per-case of $1.20 by the average of the number of cases sold in each of the two most recent years of operation. From that result there was deducted the amount of the corporations' liabilities; the remainder was $268,000. The figure of $1.20 per case was used because it was the quotient resulting from dividing the purchase price of the assets bought from the previous franchise holder, including the amount of liabilities assumed, by the average of gross annual number of cases sold in the two years preceding the purchase.

·The valuation figures from the three different processes were added together and divided by three; the resulting figure was $205,000; 12 percent of that was $24,600, which had applied to it a reduction of roughly 15 percent to take care of the fact that Vaughan's shares were a minority interest. The result was a valuation of $21,000. The stock was evaluated as of January 31, 1966.

Hermann Bischoff, an appraiser, testified for Vaughan that the shares were worth in excess of $300 per share. His appraisal was based only upon a ratio of price to earnings of 16:1; he did not discount the value of Vaughan's shares because of their minority position.

### The Issues

The complaint stated a cause of action for specific performance of the option agreements. It alleged the agreements were in all respects just and reasonable and the consideration received by Vaughan was adequate.

The latter allegations were denied.

In a cross-complaint, Vaughan and his wife asked for reformation of the option agreements under a claim it had been the intention to provide that they should not be required to sell for less than a third person would be willing to pay.

Vaughan also claimed that the provisions of the first numbered paragraph of the agreements become operative and that that paragraph rather than the second numbered paragraph should control in the circumstances; that he had received from a third person, on or about December 21, 1965, the writ-

ten offer of that date to purchase his shares for $59,940; and had on or about December 23, 1965 transmitted to plaintiff notice that such offer had been received.

The trial court ruled against Vaughan as to both of those claims. Vaughan and his wife have not appealed.

## The Findings

In addition to the findings unfavorable to Vaughan's contentions, the following findings were made which give the focus of the issues of law involved:

"6. On December 21, 1965 plaintiff referred to the firm of Peat, Marwick, Mitchell & Co. the determination of the fair market value of defendants' 180 shares of capital common stock. . . .

"7. The agreements, copies of which are attached as Exhibits 'A' and 'B' to plaintiff's complaint were intended by plaintiff and defendants to provide in paragraph 2 thereof that defendants would receive from plaintiff a fair price for their 180 shares of capital common stock. Peat, Marwick, Mitchell & Co. determined the fair market value of defendants' 180 shares of capital common stock to be $21,000.00 That amount is not just or reasonable and is not a fair market price to be paid to defendants for their 180 shares of capital common stock, in light of the factors considered by Peat, Marwick, Mitchell & Co. and the evidence relied upon by them in applying those factors. Peat, Marwick, Mitchell & Co. did not follow a proper valuation procedure in determining the fair market value of defendants' 180 shares of capital common stock. Peat, Marwick, Mitchell & Co. in its evaluation made certain material mistakes which resulted, in effect, in a lack of good faith in determining the fair market value of defendants' 180 shares of capital common stock.

"8. Plaintiff has not established the existence of the factors necessary to permit the agreements attached to plaintiff's complaint as Exhibits 'A' and 'B' to be specifically enforced.

"9. The agreements, copies of which are attached to plaintiff's complaint as Exhibits 'A' and 'B', do not lack consideration, are not illegal . . ."

## Other Questions

No finding was made as to whether tender was made or excused; we discount wholly the possibility that the judgment was based upon the failure to prove a tender since no argument to that effect is presented. Becase of Vaughan's dis-

avowal of any obligation to sell other than at a price offered by a third party, tender under recognized rules would have been excused. (*Towne Dev. Co.* v. *Lee*, 63 Cal.2d 147 [45 Cal.Rptr. 316, 403 P.2d 724] ; Civ. Code, § 1511.)

Vaughan's special defense that the rule against remoteness in vesting made the agreements unenforceable seems to have been based upon the fact that no period for the exercise of the option is specified. The option must have been exercised within a reasonable time after termination of Vaughan's employment (Rest., Law of Contracts, § 40). The option here was exercised within a reasonable time.

## THE FINDING THAT MATERIAL MISTAKES IN VALUATION RESULTED, IN EFFECT, IN A LACK OF GOOD FAITH

The findings are general in their language that the amount fixed was not just or reasonable, or the fair market price in light of the factors considered, and that PM&M did not follow a proper valuation procedure.

The trial judge did, however, in a written memorandum opinion discuss various factors that led him to the conclusion that specific performance should be denied.

Among the evidentiary matters discussed in the memorandum opinion was that the accountant did not act unreasonably in not taking into account information as to the written offer to purchase that emanated from Mrs. Lentz payable over a period of 10 years.

Concerning the proper method of determining book value, the memorandum opinion expressed that a current appraisal of tangible assets should be made, and values assigned to such nontangible assets as good will and the franchise from CCC ; but concluded that even so book value was not a wholly satisfactory yardstick for valuing shares representing a minority interest; that it was more useful in a sale of all the assets. In that connection, it may be noted that plaintiff and his associates had paid $300,000 and assumed obligations of $220,000 for the assets transferred to Valley and I-V; that Vaughan paid only $18,000 for 12 percent of the issued shares of those corporations. It is possible that the values placed on the shares by Vaughan, Lentz, and perhaps Vaughan's expert witness, were to some extent colored by those facts.

In the memorandum opinion, the judge found fault with the price-earnings ratio method as used by the accountant, stating that the adoption of a ratio based upon the price-

earnings ratios of companies not engaged in the same type of business; or based upon the ratio to earnings more than a month removed from the valuation date was not in good faith.

Concerning the method of valuation based upon gross sales, the memorandum opinion stated:

". . . to use the same price per case per year when the company is in economic doldrums as at a later period when the company has effected an economic turn-about and is on the rise is not within this Court's concept of a good-faith appraisal."

The memorandum opinion considered reasonable the discounting by 15 percent the valuation of the 12 percent minority interest.

Vaughan's brief holds up as an error of the accountants that they viewed the shares of both corporations as being of the same value since all assets of I-V were being used for the corporate purposes of Valley.

The judgment involved in making that approach to valuation is not one touched upon by the court in its memorandum opinion and is not the object of a specific finding. It is to be noted, moreover, that the expert witness for the Vaughans, in his appraisal, considered the shares of both corporations as of the same value per share.

Because the findings fail to specify wherein the valuation process was defective as related to the evidence, they leave it possible to argue, as Vaughan does in his brief, that the failure to value the underlying assets, rather than accepting their values as carried on the books, and the failure of the accountant to consider the written offers emanating from Mrs. Lentz and her son, support the findings.

The views of the trial judge concerning the details of the valuation procedures followed by PM&M are reasonable; in effect an arbitrary choice was made as to the net yield from an investment desired by a well informed investor; equally arbitrary, no doubt, was the price-earnings ratio adopted by Vaughan's expert witness, in not giving consideration to the facts that there had been no sales of the shares except those made by plaintiff to employees of CCSD, that the shares were closely held, and not of proven marketablility.

### THE EFFECT OF SECTION 1280, SUBDIVISION (A), OF CODE OF CIVIL PROCEDURE

In their brief on appeal, the Vaughan's raise the point that the agreements that give rise to the present litiga-

tion call for the arbitration in the manner provided by section 1280 and following of the Code of Civil Procedure; that because those methods were not followed the judgment was proper for that reason if for no other.

Section 1280, subdivision (a), Code of Civil Procedure, now provides:

" 'Agreement' includes but is not limited to agreements providing for valuations, appraisals and similar proceedings and agreements between employers and employees or between their respective representatives."

Although the written conclusions of law do not mention either section 1280, subdivision (a) or the failure to follow the arbitration statutes in their requirements of a hearing and right to present evidence before the arbitrator, the memorandum opinion indicates that, in the judge's view, those matters afforded a sufficient reason to deny relief to the plaintiff. The court wrote: "Since this is an agreement specifically within the code as amended, and the provisions of the code regarding the procedural aspects of the valuation process by a third party have not been followed, it therefore follows that specific performance of this agreement should be denied and the matter of determination of price be referred back to the parties for proceedings in accordance with their agreement and the law applicable thereto."

Assuming that the 1961 amendment to section 1280, Code of Civil Procedure, brings all agreements providing for a valuation within the statutory compulsory arbitration provisions, it appears that both parties to the agreement have waived the right to compel arbitration of the question of value of the Vaughan stock.

The record does not disclose that Vaughan claimed earlier that the valuation made by PM&M was defective because it was not made in compliance with the statutory formula for an arbitration proceeding. It is true that when the complaint herein was filed on December 31, 1965, and perhaps when Vaughan's answer and cross-complaint were filed on January 26, 1966, the valuation had not been completed; however, a joint statement waiving pre-trial filed on July 28, 1966 stated that "all issues are joined by the pleadings."

The trial court, in its memorandum opinion, may have for the first time brought the question to the surface. However, the matter was touched upon during the trial when counsel

for Vaughan argued to the court on the admissibility of the evidence of his expert witness; at that time he argued that the appraisal called for by the agreements was not an arbitration.

Thereafter two sets of findings were prepared by counsel for the Vaughans, one of which was adopted by the court. In neither was mention made of any failure to comply with the compulsory arbitration procedures; no finding was made that the parties had or had not waived the statutory arbitration; the proceedings were not suspended until a statutory arbitration should be had; the judgment has all the characteristics of one that, when final, would be a complete bar to further action by plaintiff to obtain arbitration or otherwise.

The action cannot be regarded as one in which plaintiff seeks confirmation of an arbitration award by the court.

The question of waiver of the right to have or compel arbitration is ordinarily a question of fact under section 1281.2, Code of Civil Procedure. (*Sawday* v. *Vista Irr. Dist.*, 64 Cal.2d 833, 836 [52 Cal.Rptr. 1, 415 P.2d 816]; *Brunzell Constr. Co.* v. *Harrah's Club*, 253 Cal.App.2d 764, 779 [62 Cal.Rptr. 505].) Prior to the enactment of the present statutes, it has been held that a party waives his right to arbitrate an issue by failing to plead such right. (*Trubowitch* v. *Riverbank Canning Co.*, 30 Cal.2d 335, 339 [182 P.2d 182]; *Jones* v. *Pollock*, 34 Cal.2d 863, 867 [215 P.2d 733].)

The facts in the case at bench permit of only one conclusion, that any right to compel a statutory arbitration has been waived by all parties to the litigation.

We may speculate that the trial judge, in writing his memorandum opinion, had in mind that the parties thereafter might resort to arbitration. The findings and judgment fail to provide for that possibility. The finding that plaintiff: ". . . did not waive, release or relinquish, nor was plaintiff estopped from asserting the rights which he may have had under the agreements." is not interpreted by us as pertaining to rights to arbitration, but as disposing of special defenses of waiver and estoppel raised by the answer.

Since there has been a waiver of the right to arbitration under the statutory scheme, the failure of the accountants to provide for hearings with the right of the parties to present evidence required in a statutory arbitration cannot be said to have prejudiced Vaughan's rights or the rights of plaintiff to whatever relief he might otherwise have been entitled.

### The Effect Upon Plaintiff's Right to Specific Performance of Error Amounting to Bad Faith in the Valuation

At this point we meet a problem that is left unsolved by the findings of fact: Why is plaintiff's right to specific performance to be defeated by the acts of the accountants? It was not found that the method of valuation or the result was influenced or procured by any act of plaintiff; or that PM&M was the agent of the plaintiff.

If there had been such a finding of agency, then it might have been said that the amount of the consideration was left "to the discretion of an interested party" within the meaning of section 1611, Civil Code, thereby placing upon the court the burden of determining what the shares were "reasonably worth."

In the absence of a finding supported by sufficient evidence that bad faith on the part of plaintiff himself was responsible for the method of valuation and the result, we believe he should not be denied a right to specific performance, if he otherwise had such right, because of the error of the accountant.

In *Piedmont Publishing Co.* v. *Rogers,* 193 Cal.App.2d 171 [14 Cal.Rptr. 133], an accounting firm was to determine "total book value" of certain shares in a television broadcasting company under a contract giving an option for their purchase. In making the appraisal, the accountants wholly omitted any allowance for good will and for a franchise from a national television network. On appeal, the case was remanded with directions to the superior court to ascertain and declare the fair market value of the good will and to add the proper proportion of that to the value of the optionor's shares as fixed by the accountant.

In *Piedmont Publishing Co.* v. *Rogers, supra,* 193 Cal.App. 2d 171, 188, the accountant was made a party by a cross-complaint filed by the optionor. The reviewing court noted that the trial court had found that there was no fraud or fraudulent conduct on the part of the optionee or the accountants. The court on appeal also noted: "We do not believe that gentlemen in control of Piedmont's policies, with their standing in their community and state, meant to use an accounting method that would cut down the fair value of Miss Pickford's stock, if they exercised their option. We think, rather, they intended to pay her a fair price for her participation in secur-

ing the television license, and in making the television station an outstanding success.''

We do not interpret the decision in *Piedmont* as implying that if the accountant had not been free of error amounting to fraud, relief would have been denied to the plaintiff optionee.

## The Relationship Between the Value Fixed by the Accountants and the Right to Specific Performance

This heading covers only a discussion whether, under rules heretofore laid down, the assumed failure of PM&M to determine the true market value of the shares as of January 31, 1966 defeats plaintiff's desire for specific performance on the ground of inadequacy of consideration.

We may assume that it was the intention of the parties that the price to be paid would be the value of the shares fixed as of December 21, 1965, the date of the exercise of the option by plaintiff. That seems to have been assumed by the parties and the trial court.

However, in passing upon the question whether the consideration for the contract was adequate within the meaning of section 3391, Civil Code, the adequacy should be viewed as of the inception of the contract that is sought to be specifically enforced (*Henderson* v. *Fisher,* 236 Cal.App.2d 468, 474 [46 Cal.Rptr. 173] ; *Drullinger* v. *Erskine,* 71 Cal.App.2d 492, 495 [163 P.2d 48] ; *Stough* v. *Hanson,* 46 Cal.App.2d 504, 506 [116 P.2d 77].)

In case of the exercise of an option, the value at the time the option was given is considered the measure of the adequacy of the consideration. (*O'Connell* v. *Lampe,* 206 Cal. 282, 285 [274 P. 336].)

It follows that even though the valuation of PM&M may not have been correct as to the price to be paid by plaintiff for the shares, it was not, therefore, inadequate as of the date of the option agreement, which was executed within the first 15 months of operation of the business of the two corporations. It may be said that there is no evidence that the value of the shares on April 8, 1963, the date of the contracts, was in excess of the price paid by Vaughan.

## The Effect of the Findings and Judgment

We think the judgment may not be supported on the theory that the agreements called for arbitration. The right to have arbitration, if implicit in the agreements, has been waived by both parties.

The finding as to the accountants' delinquencies is not matched by any finding that plaintiff is chargeable with such delinquencies. We are of opinion that unless personally blameable, plaintiff should not suffer from the accountants' fault, any more than the Vaughans should.

The action was not commenced in an effort to force a sale at a figure that had been determined and which should have been known to be other than the fair and reasonable value, but was commenced before the fair and reasonable market price was or could have been determined.

The findings that the value fixed by the accountants was not the fair market value of the shares does not go to the adequacy of the consideration expressed in the agreements at the time they were made. Although they mentioned ''fair market value as determined by'' PM&M, there is nothing to suggest that meant anything other than the true fair market value; no finding has been made of any other interpretation or intention. PM&M was not a party to the agreements and nothing in the evidence suggests that the accountants had any knowledge of the agreements until December 1965.

We believe that subsequent error in the process of determining value should not affect the question of the adequacy of the consideration as expressed in the agreements in the absence of any finding or evidence that such erroneous result was intended or procured by plaintiff.

With those considerations in mind, we believe a finding of inadequacy of consideration within the meaning of section 3391, Civil Code, to be unsupported by the evidence, and the findings supported by the evidence insufficient to deny plaintiff the relief he sought.

Among other matters dealt with in the memorandum opinion were factors that show the shares are of the kind to make the contracts proper subjects of specific performance.

The trial court fixed no value on the shares.

The judgment is reversed and the cause remanded with directions to the trial court to take such additional evidence as it deems proper; to make such additional findings as the evidence warrants; including a finding as to the fair and reasonable market value of the shares as of the date of the exercise of the option; and to decree specific performance upon the payment in full within a reasonable time to be fixed by the court of the value so found if the findings to be made as a whole entitle plaintiff to specific performance.

Brown (Gerald), P.J., and Coughlin, J., concurred.